**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **4:24-CR-1** |
| | : | |
| **JAYQUAN ALLEN JONES** | : | |
| | : | |
| **Defendant.** | : | **Honorable Elizabeth W. Hanes** |
| | : | |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

On January 9, 2024, Jayquan Allen Jones will appear before this Court to be sentenced for his involvement in the murder of Ty'Osha Mitchell. At the time of the offense, Mr. Jones had just turned 20 years old. Mr. Jones—a young survivor of an abusive, tumultuous, and impoverished background—was pulled by gang leaders into this tragic crime after it was well underway. Prior to his guilty plea in a related case before Judge Raymond Jackson, Mr. Jones had no juvenile or adult convictions, and thus has a Criminal History Category of II.[1] In consideration of Mr. Jones's highly mitigating personal history and characteristics, acceptance of responsibility, and his relative culpability in this offense, this Court should impose a sentence of thirty-five years to run concurrent with his sentence in *United States v. Jayquan Jones*, 4:23-cr-90 (E.D. Va.).

## <u>THE PLEA AGREEMENT</u>

On August 27, 2024, Mr. Jones appeared before this Court and entered a plea to a single

---

[1] On February 7, 2023, Mr. Jones took part in an attempted Hobbs Act Robbery with fellow gang members. Despite prosecuting this Court under a racketeering theory, the government charged the attempted robbery under a separate indictment. Mr. Jones pleaded guilty to attempted robbery and was sentenced to seventy months. *See United States v. Jayquan Jones*, 4:23-cr-90 (Judgment) (Aug. 29, 2024).

count of use of a firearm resulting in death in violation of 18 U.S.C. § 924(j). Mr. Jones entered

his plea pursuant to a written agreement.[2] The plea agreement was entered pursuant to Rule

11(c)(1)(C) of the Federal Rules of Criminal Procedure and provides for a sentencing range of

thirty-five to forty-five years. Codefendants Donnisha Goodman and Hezekiah Carney face the

same sentencing range.[3]

## THE GUIDELINES

The presentence report properly calculates Mr. Jones's Guidelines as 360 months to life.

The low end of Mr. Jones's agreed sentencing range (420 months) is thus five years (60 months)

above the low end of his guidelines. Mr. Jones is a Criminal History Category II.

## OUTSTANDING OBJECTIONS TO THE PRESENTENCE REPORT

As required by the Court's Sentencing Procedures Order, Mr. Jones provides notice of his

outstanding objections to the presentence report. Mr. Jones's unresolved objections are as

follows:

### A. *We Object to the Inclusion of an Unrelated Assault in Which Mr. Jones Was Not a Participant in His Offense Conduct.*

The "Offense Conduct" section of Mr. Jones's presentence investigation report ("PSR")

includes an allegation that Donnisha Goodman, Jamica Langley, and Hezekiah Carney beat and

caused "serious bodily injury" to an unidentified person. ¶ 12 (sentences 1–3). There is no

allegation that Mr. Jones was involved in this event, which was unrelated to the homicide of

Ty'osha Mitchell. In fact, neither the government's cooperating witnesses nor the victim of that

beating claim that Mr. Jones was involved or present for that offense. Mr. Jones has pleaded

guilty to a single count of Use of a Firearm Causing Death, with an offense date of May 6, 2023.

---

[2] Document ("Doc.") 104 (Plea Agreement).
[3] *See* Doc. 100 (Goodman Plea Agreement); Doc. 108 (Carney Plea Agreement).

An unrelated assault in which he was not involved does not fall within the definition of relevant conduct under §1B1.3.

### B. Mr. Jones Objects to the Inclusion of Three Paragraphs of Uncorroborated, Incomplete, and Incorrect Allegations in "Offense Conduct."

The "Offense Conduct" section of Mr. Jones's draft presentence investigation report ("PSR") properly includes the agreed Statement of Facts.[4]  Immediately after, however, the PSR includes three paragraphs that purport to be the results of an "independent investigation" by the probation office.[5]  These paragraphs include uncorroborated and inaccurate allegations and ignore contradictory information.  After objecting to these paragraphs, Mr. Jones learned that they were drafted by probation based on selected information provided directly by the government.  Despite the characterization of an "independent investigation," Mr. Jones was not asked to provide information.

Specifically, we object to the following representations contained in those paragraphs:

¶11 claims that according to ███████████, "after **Jones** observed the laughing emoji from T.M. . . . **Jones** told the group let's take a ride, which meant going back to T.M.'s residence."  This paragraph characterizes Mr. Jones as the person who suggested returning to Mitchell's home. ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

---

[4] *See* Page 5–10, ¶10.
[5] Page 10–11 at ¶¶ 11–14.
[6] ████████████████████████████████████████████████
████████



¶11 also claims that according to ████████, "**Jones** had a new Smith and Wesson firearm with him . . . and **noted he was excited to use it**." (emphasis added). ████████



¶11 states that according to ▮▮▮▮, "**Jones** told T.M. to walk into the woods.  **Jones** then shot at T.M. and T.M fell to the ground." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

¶ 11 also states that according to ▮▮▮▮, "**Jones** could be heard saying the 'bitch not dead.' Additional gunshots were then heard." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



To further illustrate the one-sided nature of the purported independent investigation, both paragraphs 11 and 12 also selectively omit the mitigating information provided by the government's witnesses.

Mr. Jones also objects to the content of ¶ 13, which relates the statements of a thoroughly unreliable jailhouse informan





*See,
e.g.*, *Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d Cir. 2004) ("As a general matter, we note
that numerous scholars and criminal justice experts have found the testimony by 'jail house
snitches' to be highly unreliable.'"); Daryl K. Brown, Essay, *Rationing Criminal Defense
Entitlements: An Argument from Institutional Design*, 104 COLUM. L. REV. 801, 824 (2004)
(noting that "jailhouse informants with critical state evidence are sources with higher-than-
average rates of unreliability."); Steve Mills & Ken Armstrong, *The Inside Informant*, CHI. TRIB.,
Nov. 16, 1999, at 1 (exemplifying the stories of informants who latch on to high-profile cases—
especially murder cases—and invent "confessions" for their own benefit).

In sum, Mr. Jones objects to paragraphs 11–13. There is a lengthy, detailed statement of
facts in this case for a reason. The statement of facts stipulates what the "the United States
would have proven . . . beyond a reasonable doubt with **admissible and credible evidence**."[23]
Mr. Jones requests that the Court rely on the statement of facts, and not on the inaccurate, one-
sided, and uncorroborated allegations added in paragraphs 11–13.

## STATUTORY SENTENCING FACTORS

Mr. Jones's sentence should be "sufficient, but not greater than necessary" to serve the

[23] Doc. 105 at 1 (emphasis added).

purposes set forth in 18 U.S.C. § 3553(a)(2). Because the guidelines are only advisory, this Court has the power to determine that a sentence below the guidelines strikes the proper balance.[24] In sentencing Mr. Jones, this Court "shall consider . . . the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a).

Mr. Jones is a very young man who was barely 20 years old at the time of this offense. Youth is always mitigating, but it is particularly mitigating for someone like Mr. Jones, whose early life provided few positive developmental opportunities. As set forth below, Mr. Jones was raised in the Gilpin Court housing project by an abusive single mother who struggled with alcoholism and rage. Mr. Jones's biological father—a crack and heroin addict—provided no emotional or physical support, instead denying Mr. Jones as his son. As a result, Mr. Jones grew up in a chaotic environment where poverty, violence, and hunger were the norm. Still maturing, Mr. Jones became caught up with peer group leaders whose acceptance and influence led him to become a gang member. These peer group leaders organized and began this offense, pulling Mr. Jones into it well after they had planned and started it.

**A. <u>Personal History and Characteristics of Mr. Jones</u>**

Jayquan[25] is a thoughtful young man from an extremely disadvantaged background. At the time of this offense, Jayquan had just turned 20 years old and was still living with his mom in the Gilpin Court housing projects in Richmond, Virginia. Jayquan had recently completed high school and had spent much of 2022 working at Panera Bread, where he met his fiancé, Ayahnacee. At the same time, Jayquan had fallen under the influence of older, savvier gang members who promised him identity and acceptance. To understand the value Jayquan placed

---

[24] *United States v. Booker*, 543 U.S. 220, 259 (2005).
[25] Due to the family's shared last names, the rest of this Memorandum uses first names.

on being accepted by these peers, it is critical to understand how little acceptance and stability he had experienced in his young life.

Jayquan is the third child of Renee Langley. It is impossible to understand Jayquan's young life without understanding his mother's traumatic background and the limits it imposed on her ability to provide Jayquan with stability, support, and a safe environment. Renee is the daughter of Connie Langley and James Bullock, who met in North Carolina. Reportedly, James was in his late twenties or early thirties years old when he had his first child (Victoria) with Connie, who was 15 at the time. Within the next few years, James and Connie had moved to Washington, D.C., where they had three more children. Renee, born in 1976, was the second.

The Langley family settled in the Anacostia neighborhood of Washington, D.C. Just two decades before, Anacostia had been "an all-white enclave, with African Americans segregated into the nearby sections of Barry Farm/Hillsdale."[26] After school desegregation was mandated in 1954, however, white flight had dramatically changed the neighborhood. According to the Anacostia Community Museum's chief curator, desegregation resulted in a "rapid and profound transformation of the neighborhood," including a decrease in resources.[27] This "desegregation was followed by decades of government neglect, shabby housing, and growing poverty" in Anacostia.[28] During the same period, a federal "urban renewal project" had razed historically

---

[26] Brendan L. Smith, *How Washingtonians have shaped and reshaped one neighborhood over more than five decades*, SMITHSONIAN INSIDER (June 25, 2018), *available at* https://insider.si.edu/2018/06/how-washingtonians-have-shaped-and-reshaped-one-neighborhood-over-more-than-five-decades/ (last accessed Dec. 22, 2024).
[27] *See id.*
[28] *Id.*

Black neighborhoods in Southwest D.C.,[29] displacing numerous families to Anacostia, among other neighborhoods.

By the time the Langleys settled in Anacostia, the neighborhood was struggling with poverty and unemployment. Renee Langley and her siblings grew up in the dilapidated Finsbury Square Apartments, which are pictured below:



*Finsbury Square Apartments, 1983 (when Renee was 7)*[30]

---

[29] Linda Wheeler, *Broken Grounds, Broken Hearts – Urban Renewal Cost Homes*, THE WASHINGTON POST, June 21, 1999, *available at* https://www.washingtonpost.com/wp-srv/local/2000/renewal062199.htm (last visited Dec. 22, 2024).
[30] All Finsbury Square photographs are courtesy of the Smithsonian's Anacostia Community Museum's digital archives.





*Finsbury Square Apartments, 1983 (when Renee was 7)*

In 1988, when Renee was twelve years old, her father died, purportedly of a heart attack.

Renee recalls her father getting off work every day and going to a cousin's barber shop, where he

sat in a back room and drank beer and liquor. Before James's death, Renee and her siblings liked

to visit him at the barbershop, which is where he is believed to have suffered a heart attack at age 49. It is unclear whether James's death was alcohol related.

Not long after her father's death, Renee had her first child, Patrice, at age fourteen. According to Renee, the father of her child, David Pope, was in his twenties. Her mother— perhaps affected by her own teenage pregnancy with an adult man—did not object to Pope's sexual involvement with her young daughter. After Patrice's birth, Renee was forced to move from Eastern High School to Anacostia High School, which had a program for teenage mothers. This was a difficult time for Renee, who had both lost her father and given birth while finishing middle school. According to a 1995 psychoeducational evaluation of Renee, "[i]t appears that she repeated the ninth and tenth grades and felt too old to be in Anacostia High School."[31]

At the same time, Renee's grieving mother started sleeping with a man from their neighborhood. Unlike Renee's father, who was much older than Connie, this man was a decade younger. 

---

[31] March 24, 1995, Psychoeducational Evaluation of Renee Langley (attached as **Exhibit 7**).
[32] *See, e.g.*, National Park Service, "1992 AIDS Ashes Action at the White House," https://www.nps.gov/places/aids-ashes-action.htm (last accessed Dec. 22, 2024) ("When the first Ashes Action took placed in 1992, AIDS was the number one cause of death for men in the USA ages 25 to 44."). At the outset of the AIDS epidemic, "the American government did little to address [it], a failure to act that many attribute to the fact that HIV/AIDS was primarily affecting gay men, intravenous drug users, immigrants and racial minorities." The History Channel, "AIDS Crisis Timeline" (June 20, 2024), *available at* https://www.history.com/topics/1980s/hiv-aids-crisis-timeline (last accessed Dec. 22, 2024).

██████████████████████████████████████

████████████████████

After her parents' early deaths, Renee was a sixteen-year-old single mom with few emotional, educational, or financial resources. She lived with her siblings, Victoria (then 21), Jermaine (then 17), and Tony (then 14). Victoria had given birth to her first child (Renee's niece) around the time of their mothers' death, and Tony had dropped out of school. According to Renee's 1995 evaluation, Renee's "decision to terminate her formal education . . . coincided with the terminal illness of her mother and the need to raise her daughter and her niece."[34]

At the same time, Renee began abusing substances for the first time, portending her lifelong struggle with alcoholism. By age 19, her psychoeducational evaluation read:

> She has [a] brief history of experimentation with poly illicit substances which include alcohol, marijuana and phencyclidine (PCP). Both she and the presentence report indicate that her use of phencyclidine and cannabis occurred shortly after the death of her biological mother. She smoked it every day beginning in the summer of 1993 and after a brief hiatus resumed use of the substances from March 1994 through November 1994. She reported that she smoked (PCP) to stop thinking about her mother but found that it made her think more about her mother. The drug also had the effect of making me "angry/crazy."[35]

Renee was not the only one of her siblings to struggle with substance abuse. By 1995, when Victoria was only 21 with two children under the age of four, she had faced drug-related charges. Renee told her evaluator "that it was better when her sister was in fact in jail so she could get off drugs. The implication [was] that her sister, Victoria, is addicted to drugs."[36] At the time,

---

[33] *See* Dave Singleton, *Anniversary of AIDS in Washington: 30 Years Later*, WASHINGTONIAN (June 24, 2011), *available at* https://www.washingtonian.com/2011/06/24/anniversary-of-aids-in-washington-30-years-later/ (last accessed Dec. 22, 2024).
[34] Exhibit 7 at 3.
[35] Exhibit 7 at 2.
[36] Exhibit 7 at 4.

Victoria was also "engaged to marry [a man] who [was] currently confined for Assault with Intent to Kill."[37]

As a juvenile, Renee was arrested for Unauthorized Use of a Motor Vehicle. She crashed the car "into a post" and "received some outpatient medical care." Apparently, she also "saw a psychiatrist/psychologist at the Receiving Home."[38] In 1994—when Renee was eighteen and actively abusing PCP, marijuana, and alcohol—a D.C. police officer saw her running down the street shortly after midnight. She was "running with a green trash bag, [with] what looked like to be the butt of a shotgun sticking out of it."[39] Renee claimed that someone was chasing her. Inside the bag, police found "[a] 12-gauge, sawed-off shotgun" loaded with four rounds.[40] Renee was charged with four felonies counts related to this event.[41]

As Renee faced her criminal case, she handed over custody of her daughter Patrice to a woman named Latonia Long. Latonia's oldest son had been Connie's godson, so Latonia was a quasi-godparental figure to Renee. Renee was sent to a halfway house for pretrial release, where her conditions include a requirement that she "stay away from drugs."[42] Subsequently, Renee pleaded guilty to possession of an unregistered firearm. In preparation for sentencing, Renee was given the psychoeducational evaluation that is attached as Exhibit 7 to this Memorandum. In addition to describing Renee's background, the evaluation summarized the blend of traumatic

---

[37] *Id.*
[38] Exhibit 7 at 3.
[39] Transcript, *United States v. Renee Langley*, No. 94-0384 (D.D.C. Sept. 7, 1994) (attached as **Exhibit 8**), at 3–4.
[40] *Id.* at 5–6.
[41] Indictment, *United States v. Renee Langley*, No. 94-0384 (D.D.C. Aug. 31, 1994) (attached as **Exhibit 9**).
[42] Release Order, *United States v. Renee Langley*, No. 94-0384 (D.D.C. Nov. 7, 1994) (attached as **Exhibit 10**).

events, untreated grief, substance abuse, and lack of guidance with which Renee entered early adulthood and, ultimately, parenthood.

The evaluation noted that although Renee could have functioned better "[u]nder more optimal developmental circumstances," her abilities had been "seriously undermined developmentally by psychological trauma related to life events."[43] Among other things, Renee's "social judgment or ability to discern right from wrong in a variety of social contexts [was] extremely low."[44] In particular, the evaluator cited Renee's lack of "moral developmental, parent guidance and moral education" as having impeded her judgment.[45] The evaluator also took note of Renee's deep problems with anger. Renee was "not conscious of the full range of human emotion," and was "particularly unaware of how her feelings states adversely impact upon her judgment which, as noted, has been compromised developmentally, particularly anger."[46] Renee's substance abuse "exacerbated her anger and aggression," and "[s]he remain[ed] angry and given to moodiness."[47] Her evaluator also noted the lack of therapeutic resources that had been provided to Renee.

Renee was sentenced to eighteen months in prison.[48] The Court recommended that Renee receive substance abuse treatment for both drugs and alcohol and that she "be placed in the Intensive Confinement Program (Boot Camp) for women."[49] A few months later, Renee wrote a *pro se* motion requesting a return to the halfway house, noting that "the only time I

---

[43] Exhibit 7 at 4.
[44] *Id.* at 5.
[45] *Id.*
[46] *Id.*
[47] *Id.* at 9.
[48] Judgment, *United States v. Renee Langley*, No. 94-0384 (D.D.C. April 5, 1995) (attached as **Exhibit 11**).
[49] *Id.* at 3.

messed up is when I got an dirty urine."[50]  Renee claimed, "I don't want drugs in my life anymore.  Since I've been here my life has really been good without any drugs."[51]  This letter from a young Renee is a good representation of her struggles and the disadvantages she was facing.  Renee wrote that she wanted to get a job, finish school, and "get another apartment so that I can get my daughter back."[52]  Renee also cited a desire "to help support my little brother," who was also "locked up here" in D.C. jail.  Renee wrote that her grandmother "made me loose [sic] my apartment," "got my check cut off," and "is no kind of support to me or my brother."[53] "I took care of my brother when my mother passed away," she added, "Now he needs me more now than he ever did."[54]

The Court denied Renee's motion, and she served the remainder of her time at the Federal Prison Camp in Bryan, Texas.  While Renee was in prison, Latonia Long obtained full custody of Patrice.  On August 5, 1996, Renee began her two-year supervised release term.[55] Renee soon violated her terms and was ordered to the U.S. Parole Commission Sanction Center Program.[56]  However, she absconded from supervision, vacating her home and "fail[ing] to report to that facility."[57]  She never regained custody of her first daughter, Patrice.

Renee recounts that after prison, she returned to D.C. and tried to find a job but could not find stable employment or a place to live.  Homeless, Renee bounced around between the homes

---

[50] Motion to Reduce Sentence, *United States v. Renee Langley*, No. 94-0384 (D.D.C. Aug. 25, 1995) (attached as **Exhibit 12**).
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Request for Bench Warrant, *United States v. Renee Langley*, No. 94-0384 (D.D.C. Nov. 14, 1997) (attached as **Exhibit 13**).
[56] *Id.*
[57] *Id.* at 2.

of various friends.  On a trip to Richmond, Renee met Gary Jones, and they had what she

believed to be a "one night stand."  But Gary soon invited Renee to move out to Richmond.  It

was at that time that Renee absconded from supervised release, going to stay with Gary instead

of attending her Sanction Program.  (Eventually, Renee was arrested for a supervised release

violation in 1998, then served nearly five months before returning to Richmond.)

In Richmond, Renee soon had a child with Gary.  Gary immediately accepted Jamica—

Jayquan's older sister—as his own.  When Jayquan was born in January 2003, however, Gary

rejected him.  Renee attributes this in part to the fact that Jayquan looks more like her, while

Jamica looks like her father.  Additionally, during the time that Jayquan was conceived, Renee

and Gary were living with one of Gary's cousins, Shelly.  Both Gary and Shelly were on drugs,

and Gary began sleeping with one of her friends.  Shelly spread a rumor that Renee was cheating

on Gary, and that Jayquan was not Gary's son.  According to Renee, Gary publicly denied

Jayquan to his friends and family, sometimes claiming that Renee had asked another man to

forge his signature on Jayquan's birth certificate.  Gary never accepted Jayquan, who remains

anguished by his father's rejection.



*Jayquan at home, age 16 Months. A lighter is on the floor next to his pacifier.*

Renee and Gary had an off-and-on, abusive relationship for much of Jayquan's life. Both parents struggled with substance abuse, fueling anger and aggression. Renee admits that she and her family members drink heavily. Indeed, Renee lost her younger brother, Tony, to an alcohol-related death when he was only twenty-five years old.[58] Renee routinely stayed in the home, on the couch, drinking. Meanwhile, Gary used crack cocaine and heroin, which he did not hide from Jayquan. Renee recounts an incident in which Gary showed a young Jayquan how he could put a straw up one side of his nose and pull it out the other. Often abusing substances, dealing

---

[58] According to Renee, Tony died after getting into an argument with his girlfriend. At the time, they were living in an apartment complex in Anacostia. Tony jumped a gate and slid into the snow, where he passed out due to intoxication. His body was in the snow for days. No one knew that he was missing because they assumed he was just out drinking.

crack cocaine, and seeing other women, Gary lived with Renee and the children only sporadically.

The relationship between Gary and Renee was also marked by violence. In February 15, 2002—approximately one year before Jayquan's birth—Renee was charged with domestic assault and battery, and ordered to the Family Violence Prevention Program in Richmond.[59] Renee completed classes in both Anger Management and Substance Abuse. When she had received no new domestic charges by October 15, 2002, Renee stopped receiving court-ordered services.[60] But on April 10, 2003—when Jayquan was less than three months old—Renee was again charged with an assault and battery on Gary.[61] According to Renee, this charge stemmed from an incident in which she had stabbed Gary, in part because he had cheated on her. Renee attempted to stab Gary in the chest, but Gary raised his arm, and Renee stabbed him there instead. The charge was ultimately dismissed when Renee threatened Gary not to come to court. By her own report, Renee admits that she has issues with anger and temper, and that she has a history of threatening and assaulting people.[62]

Jayquan grew up in Gilpin Court. Gilpin is Richmond's first public housing development and its most populated.[63] "Gilpin is located in Jackson Ward, once the epicenter of Richmond's African-American community."[64] Beginning in 1942, however, a "slum clearance project" resulted in the demolition of "hundreds of homes and displaced much of the neighborhood's

---

[59] Renee Langley Family Violence Prevention Documents (attached as **Exhibit 14**), at 1–2.
[60] *Id.*
[61] Court Documents, *Commonwealth v. Renee Langley* (attached as **Exhibit 15**).
[62] *See* Pre-Sentencing Forensic Psychological Evaluation of Jayquan Jones (Dec. 18, 2024) (attached as **Exhibit 16**).
[63] City of Richmond Dep't of Planning & Dev. Review, "Priority Neighborhoods" 60 (March 2023), *available at* https://www.rva.gov/sites/default/files/2023-03/R300_Draft_PriorityNeighborhoodsAmendment_230310.pdf (last accessed Dec. 22, 2024).
[64] *Id.*

majority Black and immigrant population."[65]  Between 1942 and 1971, Richmond built Gilpin

Court, displacing many families into the projects.  The residents of Gilpin Court live with

extremely high rates of community violence. Today, "the violent crime rate is 2.4 times the city

rate."[66]  As a result, Jayquan's youth was marked by frequent exposure to violence and death.



*Jayquan's home (Unit A), now vacant, in the 1300 block of St. John Street*

---

[65] *Id.*
[66] *Id.*

In advance of this sentencing, Mr. Jones was evaluated by Dr. Sharon Kelley, a licensed clinical psychologist and assistant professor at the University of Virginia's Institute of Law, Psychiatry, and Public Policy. Dr. Kelley notes that "[b]y all accounts, Mr. Jones grew up surrounded by community violence."[67] When interviewed by Dr. Kelley, Renee "described routine 'shootings, breaking in people['s] houses, robberies, lots of fights' that were an 'everyday thing around here—if it ain't one it's the other.'"[68] Both Jayquan and his mother described consistent exposure to the trauma of violent crime. As Renee reported to Dr. Kelley,

> We sat on the porch one day, the people were shooting out of nowhere. I grabbed the kids to try to get them in the house. [Other times] I would call them and tell them to stay [where they were]—there's a shooting. Where we was living, we saw a dead body from the front porch. We seen [sic] a lot of crazy stuff around here, people getting shot in the store, stabbed. There ain't nothing we haven't seen.[69]

Notably, according to counselors from a local youth ministry, Mr. Jones also lived in the "chilly willy hole" of Gilpin Court. The "chilly willy hole" is a dead end, making it a preferred location for drug activity, which can often lead to violence.[70] The youth counselors observed that "severe violence, including death, seemed normal for most of the youth from the area."[71] Although the counselors would attempt to help transport children to activities after a murder, "they quickly learned that was not necessary," as "that was [the children's] normal—they would walk right past where a person got murdered."[72]

---

[67] Exhibit 16 at 2.
[68] *Id.* (alteration in original).
[69] *Id.* at 5 (alterations in original).
[70] *See id.*
[71] *Id.*
[72] *Id.*

Data mapping vividly demonstrates the high rates of community violence during

Jayquan's formative years.  In just the five years during which Jayquan was 9 to 14 years old,

Gilpin Court had one of Richmond's highest rates of both homicide and overall crime:



Map: Nienke de Haseth · Source: Richmond Police Department, Richmond GeoHub · Created with Datawrapper

# Total Crime Incidents by Neighborhood in Richmond, Virginia (2012-2017)

**Total Number of Reported
Crime Incidents**

0                    5,000



*Crime incidents include homicide, assault, robbery, burglary, theft, vehicle theft, sex offenses, vice, and "other crimes"*

Map: Nienke de Haseth  • Source: Richmond Police Department, Richmond GeoHub • Created with Datawrapper

The data also corroborates witness accounts of Jayquan's frequent exposure to violence and crime. In the same five years of Jayquan's pre-adolescence, he was surrounded by homicides, burglaries, and robberies. These crimes permeated not only the location of his home, but also his paths to school and after-school programs.



**Growing Up in the Crossfire: Jayquan's Exposure to Neighborhood Violence from Ages 9-14**

Homicide, Robbery, and Burglary Incidents Reported in Richmond's Gilpin Court, Jackson Ward, and Carver Neighborhoods (2012-2017)

Jayquan's home

George W. Carver Elementary School

After-School Programs at the Calhoun Center (STEP Richmond & Youth Ministries Entertainment)

Homicide

Robbery

Burglary

*Note: 55 robberies and 49 burglaries have been excluded from this map as they occurred at locations already represented by other plotted incidents*

Map: Nienke de Haseth • Source: Richmond Police Department • Created with Datawrapper

In addition to high rates of community violence, the residents of Gilpin Court live with unimaginable poverty. "The poverty rate is nearly 3.5 times that of the city at 80% and . . . [t]he majority of Gilpin households have an annual income of less than $10,000."[73] Jayquan's family was no exception. Throughout his young life, Jayquan lived on the economic margins.



*Renee in the family home in Gilpin Court, Circa 1997*

For example, when Jayquan was a few months old, his mother filled out a form to obtain indigent defense services for her assault on Gary. Renee's form shows that she had no income, no assets, and only $320 in TANF to support the family of three.[74] Renee explained to Dr.

---

[73] City of Richmond Dep't of Planning & Dev. Review, "Priority Neighborhoods" 60 (March 2023), *available at* https://www.rva.gov/sites/default/files/2023-03/R300_Draft_PriorityNeighborhoodsAmendment_230310.pdf (last accessed Dec. 22, 2024).
[74] Exhibit 15 at 2.

Kelley that she received benefits for Jamica, but not Jayquan, because of family cap policies.[75]

The family also "often had to sell food stamps to pay other bills or purchase necessities not

covered by food stamps . . . ."[76] Renee had a few jobs during Jayquan's childhood, including

brief stints at Popeyes and McDonald's. When she worked at McDonald's, she recalls bringing

Jayquan and Jamica to open the fast-food restaurant before they went to daycare. According to

Renee, she lost this job after she physically assaulted a customer whom she argued with about

the cost of extra sauce for an order of Chicken McNuggets. Renee felt the woman was rude to

her, so Renee marched outside to the drive-thru and grabbed the woman by the neck. Renee

admitted to Dr. Kelley that "she did not work after [Jayquan] turned 12 years old" and "that there

was a period when she also sold drugs to 'make ends meet.'"[77]

For his part, Gary did little to support the children. In addition to denying his son—a

source of great emotional pain for Jayquan—Gary often failed to pay child support. Court

records show that by June 2006, Gary had accrued $7,833.62 in child support debt.[78] When Gary

was around, he did not provide meaningful financial support. Gary never worked, making

money only from crack sales. Notably, Gary did give the family stolen goods that he had

shoplifted. Renee recalls that Gary was "a klepto" and that the home in Gilpin Court was

furnished with his stolen wares. A neighbor who lived next to the family for nearly a decade

also witnessed their financial struggles. Over the years, Jayquan often came over to ask for food,

---

[75] Exhibit 16 at 3.
[76] *Id.*
[77] *Id.* at 3–4.
[78] Gary Jones Child Support Liens (attached as **Exhibit 17**).

share his stress and fear about his mother's drinking and the lack of income, and cry about his father's rejection.[79]

As a result, Jayquan also lacked parental role models who could teach him vocational or academic skills.  Renee recalls that she never went to Jayquan's schools because she is wary of people and does not like to leave the house.  When present, Gary occasionally took Jayquan and Jamica to school, but Renee recalls that Gary would take them on a morning crack sale first.  In addition to abusing and selling substances, Renee and Gary normalized substance use to their children.  For example, Renee admitted to Dr. Kelley that "when Mr. Jones was a teenager, she would offer marijuana to him and his friends to encourage them to stay at home."  Jayquan admitted that "by age 17, he was smoking daily—a pattern that continued until he was arrested in May 2023."[80]  Despite the lack of appropriate parental modeling, while in school, Jayquan began taking side jobs (such as lawn mowing) at a young age.  One summer, Jayquan reportedly worked at Kings Dominion as a lifeguard.  In 2022, he also worked for Panera Bread, where he met his fiancé, Ayahnacee.  Dr. Kelley notes that Jayquan is interested in obtaining more vocational training in the BOP.[81]

In the home, Jayquan was also subjected to neglect, physical beatings, and emotionally and verbally abusive behaviors such as name-calling and ridicule.  Renee admitted "that she was

---

[79] Being rejected and denied by a parent is a deeply traumatic event.  "Perceived parental acceptance and rejection greatly impact a child's development."  Sofie Lorjn, et al., *Long-Term Effects of Acceptance and Rejection by Parents and Peers on Educational Attainment: A Study from Pre-Adolescence to Early Adulthood*, 51 J. YOUTH ADOLESCENCE 540 (2022).  Among other things, "parental rejection is associated with lower achievement motivation, psychological maladjustment, and emotional instability, which may hamper academic achievement."  *Id.* Attachment is also key to developing "the resiliency to survive and recover from trauma later in life."  Craig Haney, CRIMINALITY IN CONTEXT 93 (2020).
[80] Exhibit 16 at 10.
[81] Exhibit 16 at 20.

sometimes violent with her son and used physical discipline that was, in retrospect, excessive."[82]
She told Dr. Kelley, "When I lose it, I will throw a chair, pan, a glass at you. Anything that's in
reach, I'll throw it at you." She further admitted that Jayquan and Jamica "sometimes
complained that they never had any glasses or dishware because she broke these items so
frequently."[83] But Jayquan could not easily escape that trauma, as he also suffered directly from
the community violence described above.

Because of the way trauma permeated Jayquan's life both inside and outside the home,
Dr. Kelley concludes that "Mr. Jones's mental health history is notable for frequent exposure to a
range of traumatic experiences."[84] In addition to "the broad, sometimes amorphous sense of
violence that characterized his community," Mr. Jones was traumatized by his mother's
"physical and emotional abuse," as well as at least three separate shootings.[85] At age 7, Jayquan
witnessed someone "shot and killed in front of him." At 14, Jayquan was struck by a stray bullet
while running from a shooting in his neighborhood. Finally, at age 18, Jayquan witness his
godbrother die after being shot in the chest.[86]

Given his experiences, it is unsurprising that Jayquan has struggled with traumatic
memories, anxiety, and depression throughout his development. Dr. Kelley has diagnosed
Jayquan with post-traumatic stress disorder ("PTSD") and notes that he is experiencing a
phenomenon "known as 'complex trauma.'"[87] Dr. Kelley explains that unlike someone
experiencing PTSD stemming from a "*single* traumatic event . . . Mr. Jones experienced *many*

---

[82] Exhibit 16 at 3.
[83] *Id.*
[84] *Id.* at 7.
[85] *Id.*
[86] *Id.*
[87] *Id.* at 11.

severe traumatic events throughout his childhood and beyond."[88]  Complex trauma "is associated with a wider range of severe psychological, behavioral, and health problems beyond the set of symptoms that characterize simple PTSD."[89]

Critically, although complex trauma has had a serious impact on Mr. Jones's life to date, it is also a highly treatable condition.  Dr. Kelley notes that, "[f]ortunately, trauma-related conditions are treatable, and the last few decades have seen tremendous developments in research and clinical practice regarding effective trauma treatment."[90]  As a result, "there are reasons to be optimistic when treatment is available and individuals are motivated to pursue it."[91]  Dr. Kelley notes that Jayquan has availed himself of treatment opportunities and has "reported an interest in treatment and programming beyond psychiatric medication."[92]  Dr. Kelley recommends psychotherapy, medication management, substance abuse treatment, and vocational training for Jayquan in the Bureau of Prisons.[93]

In sum, it would be hard to overstate the impact of Jayquan's history of intergenerational trauma, poverty, abuse, and community violence on his development.  As psychologist Craig Haney writes, "some combinations of powerful, unrelenting risk factors and stressors are so daunting and damaging that only the most resilient of children can withstand them."[94]  Children who commit crimes often "have suffered from exposure to a toxic combination of many risk factors and traumas and few, if any, buffers or protective factors."[95]  For example, a child might

---

[88] *Id.*
[89] *Id.* at 11–12.
[90] *Id.* at 19.
[91] *Id.*
[92] *Id.*
[93] *Id.* at 20.
[94] Craig Haney, CRIMINALITY IN CONTEXT 56 (2020).
[95] *Id.*

overcome a traumatic event due to protective factors such as supportive parents or economic resources. But the children who encounter a variety of traumas and risks *without* such protective factors are more likely to find themselves in our criminal justice system. Jayquan undoubtedly encountered such a perfect storm.

Moreover, Jayquan was particularly vulnerable because of the early age at which he began to be exposed to abuse and neglect. "Young children, especially, may be particularly susceptible to certain kinds of traumas and risks. For example, as one study found, the trauma of childhood maltreatment 'has its most pervasive impact during the first decade of life.'"[96] Haney explains that "[t]here are two commonsense explanations for this," both of which apply to Jayquan. One is that young children "are more psychologically fragile and unformed; many lack the resilience with which to withstand mistreatment or have not yet developed effective coping skills . . . ." Another is that "a very young child who has been harmed by his or her early mistreatment is at risk of traveling on a troubled path over a much longer period of time."[97] For Jayquan—whose mother was arrested for stabbing his father when Jayquan was only months old—the trauma began early and surrounded him consistently for twenty years.

Notably, Jayquan's world was unsafe both inside and outside the home. Although it is well established that child abuse and neglect is damaging,[98] it is also important to understand that these conditions "are 'symptomatic of a whole *range* of family difficulties and dysfunctions,

---

[96] *Id.* at 57.
[97] *Id.*
[98] Among other things, research consistently shows that physical abuse and violence are transmitted between generations, with abused children often "acting out" and becoming involved in illegal activities as teenagers. *See* Haney, *supra*, at 97–98 (discussing studies, including a comprehensive analysis of research).

frequently including economic and environmental problems.'"[99]  Research suggests "that 'abuse should not be viewed only as an isolated incident, but as *an environment*.'"[100]  This is because "children in these abusive environments were often subjected to multiple forms of maltreatment and lived in places where chaos, disruption, disorganization, and drug and alcohol abuse were also frequently present."[101]  In other words, Renee's and Gary's abuse and neglect of each other and Jayquan cannot be understood in a vacuum.  That abuse must be situated where it occurred, in a home with little food and pervasive substance abuse,[102] located in a community with high rates of violence.[103]  This was the only environment Jayquan experienced as a child and teenager, and it shaped the way that he experienced the rest of the world as he became a young adult.[104]

　　　　Finally, Jayquan's age is an important mitigating factor in this case.  As mentioned above, Jayquan had just turned 20 at the time of the offense.  Although twenty-year-olds are

---

[99] *Id.* at 90 (quoting S. Klaus, *Innovative Approaches for Child Abuse and Neglect: Current Issues and Directions for Future Research*, Dep't of Health, Education, & Welfare 4 (1977)).

[100] *Id.* (citations omitted).

[101] *Id.*  "[R]esearch indicated that parents who were themselves living under heightened levels of stress were more likely to engage in punitive approaches for disciplining their children."  *Id.* Child abuse can occur in any socioeconomic context, but "tended to be concentrated among parents who had children when they were themselves relatively young, had unstable marriages, came from large families, were more likely to have engaged in crime, and who tended to move frequently."  *Id.* (citing R.H. Passman, et al., *Maternal punitiveness as affected by situational stress: An experimental analogue of child abuse*, 86 J. ABNORMAL PSYCH. 565 (1977)).

[102] "[P]arental substance abuse represents a . . . form of child maltreatment."  Haney, *supra*, at 99.  "Much research on the adult children of alcoholics also suggests that the family dynamics associated with parental alcoholism can have a lifelong adverse impact on children."  *Id.* (collecting research).

[103] "'[E]xposure to community violence appears to represent a unique form of trauma that is particularly associated with the development of PTSD especially among children and adolescents."  P.J. Fowler, et al., *Community violence: A meta-analysis on the effect of exposure and mental health outcomes of children and adolescents*, 21 DEV. & PSYCHOPATHOLOGY 227, 248 (2009).

[104] "[D]isadvantaged neighborhoods can produce criminogenic effects in part because they maximize the pressures to engage in crime, in part because they increase people's proximity to illegal activities, and in part because there are fewer resources and stable institutions to serve as countervailing pressures to refrain."  Haney, *supra*, at 186.

legally adults, it is scientifically well established that the brain is still developing at this age.[105]

In fact, "[l]ongitudinal neuroimagining studies demonstrate that the adolescent brain continues to

mature well into the 20s."[106] Critically, it is the judgment center of the brain that lags the rest of

development. "The frontal lobes, home to key components of the neural circuitry underlying

'executive functions' such as planning, working memory, and impulse control, are among the

last areas of the brain to mature" and "may not be fully developed until halfway through the third

decade of life."[107]

The upshot is that many of the reasons we treat adolescents differently—including the

fact that they "are more capable of change than are adults, and their actions are less likely to be

evidence of 'irretrievably depraved character' than are the actions of adults"[108]—apply equally to

twenty-year-olds. Jayquan's actions at 20 reflect youthful impulsiveness and the effects of

negative peer influences but tell us little about the adult he can become. Notwithstanding the

obstacles in his life, Jayquan is a pleasant and thoughtful young man who takes pride in his

efforts to better himself. Dr. Kelley notes that Jayquan "presented as engaged and forthcoming,"

---

[105] Exhibit 16 at 17 (noting that "rapidly expanding research shows that the human brain is not fully developed by legal adulthood (i.e., the mid-20s).").

[106] Sara Johnson, et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. ADOLESC. HEALTH 216 (2009), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/ (last accessed Dec. 22, 2024).

[107] *Id.*

[108] *Graham v. Florida*, 560 U.S. 48, 68 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005)). *Roper* recognized that "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569. *First*, juveniles are by definition immature and thus may engage in reckless behavior. *Id. Second*, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id. Third*, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570. Neuroscience now makes clear that these developmental features of adolescence extend into young adulthood.

and that he "did not demonstrate the style, common among some defendants, of denying responsibility for actions or blaming others." Rather, Jayquan "often came across as candid, thoughtful, and reflective, such as when he critiques some of his past behaviors."[109] There is every reason to believe that with treatment and continued maturation, Jayquan will apply his pleasant and thoughtful nature to being a productive member of society after his release.

### ature and Circumstances of the Offense.

Each of us is influenced not only by our past histories, but also the present situations that we find ourselves in. Although past history and present context might seem like two different things, in fact they are "highly interrelated, in the sense that our social histories help to explain the kinds of social situations and circumstances that we are likely to encounter later in life and how we react to them when we do."[110] By age 20, Jayquan had met gang members who gave him a sense of belonging and acceptance that he badly lacked at home. With these "friends," Jayquan became wrapped up in the tragic crime that is the subject of this sentencing.

The Statement of Facts accurately describes Jayquan's involvement in this crime. Notably, Jayquan faces the same sentencing range as two codefendants, Donnisha Goodman and Hezekiah Carney. When sentencing Jayquan, this Court should consider his culpability relative to that of his codefendants. A fair assessment of the defendants' relative culpability suggests that for multiple reasons, Jayquan should receive the lowest sentence.



---



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

██████ ███████████████████████████████████████

███████████████████████████████████████████████

Jayquan was not.  As stipulated in the statement of facts, "[i]n the days leading up to May 6, 2023, the defendant's coconspirators—Acacia Jackson, Hezekiah Carney, Donnisha Goodman, and Jamica Langley—determined that T.M. committed a gang infraction warranting a gang-related 'beating.'"[115] ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████The four then decided to attempt the trip again, arriving at Mitchell's home "in the early morning hours of May 6, 2023."[119]

██████████████████████████████████████████

███████████████████████████████████████████████

---

███████████████

███████████████

███████████████

[115] Doc. 105 at 4.

███████████████

███████████████

[119] Doc. 105 at 4.



Second, in addition to their greater roles in planning the offense, Carney and Goodman

bear heavier responsibility for perpetuating it. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████









Now, as a result of his actions, Jayquan faces the same 35–45 year sentencing range as Carney and Goodman. Jayquan did not, however, share his codefendants' motives, their multi-day planning, their participation in the initial beating, or direction of the offense. Rather, Jayquan made horrible choices in a highly stressful and terrifying situation. Given his age, Jayquan was more susceptible to situational stress, impulsivity, and peer influence,[137] all of which were present in this offense. At the same time, his history of trauma "magnified" his susceptibility.[138]



## REQUESTED SENTENCE

Jayquan's relative culpability should place him at the lowest end of the sentencing range applicable to both him and his two codefendants. Even a sentence of thirty-five years (420 months), however, is substantially above the low end of Jayquan's guidelines (360 months). Given Jayquan's youth and extensive mitigation, the defense asks that he receive a sentence of

---



[137] Exhibit 16 at 18.
[138] *See id.* at 19.

420 months to run concurrent with his sentence in *United States v. Jayquan Allen Jones*, 4:23-cr-90, in which he was sentenced to 70 months.

United States Sentencing Guideline §5G1.3(d) provides that "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."  Comment 4 to this guideline suggests that the Court consider:

> (i)     the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
> (ii)    the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (iii)   the time served on the undischarged sentence and the time likely to be served before release;
> (iv)   the fact that the prior undischarged sentence may have been imposed . . . at a different time before the same or different federal court; and
> (v)    any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

The § 3553(a) factors, of course, include Jayquan's extremely mitigating history and characteristics, including his young age, ongoing development, highly traumatic life history, lack of support and opportunities, post-traumatic stress disorder, and desire to receive treatment and training.  Thirty-five years is also a lengthy period of incarceration, providing deterrence, reflecting the seriousness of the offense, promoting respect for the law, protecting the public, and providing just punishment.  Additionally, it is ample time to provide Jayquan with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

Running Jayquan's sentences concurrently would also take into account the fact that his sentences in both cases are determinate and unparolable, meaning that he would not be released before serving the full thirty-five years.  And finally, concurrent sentences would account for the

fact that both cases relate to gang activity, and that the robbery in 4:23-cr-90 easily could have been charged in this indictment instead of in a separate indictment. Indeed, the government charged this case under a racketeering conspiracy, and the statement of facts embraces the elements of racketeering.[139] Among other things, the gang's racketeering activity included "assaults," "narcotics," and "robberies."[140] The robbery in 4:23-cr-90 thus could have easily been part of this indictment, in which case a sentence for that offense would have presumptively run concurrently. *See* 18 U.S.C. § 3584.

## SUMMARY

In sum, Jayquan is a young man who entered adulthood with significant trauma and few supports. Despite his disadvantages, Jayquan had no juvenile or adult convictions before his guilty plea in a related robbery case, and thus has a Criminal History Category of II. At sentencing, undersigned counsel anticipate that the Court will hear directly from Jayquan and have the opportunity to observe the thoughtful young man he is becoming. In consideration of Jayquan's extensive mitigation, age, acceptance of responsibility, relative culpability, and the above-guidelines sentencing range, the Court should sentence Jayquan to thirty-five years, to run concurrent with his sentence in *United States v. Jayquan Allen Jones*, 4:23-cr-90. Jayquan also asks the Court to recommend ongoing treatment for post-traumatic stress disorder and substance abuse, as well as vocational training.

## CONCLUSION

WHEREFORE, Mr. Jones respectfully requests that this Honorable Court sentence him to thirty-five years, to run concurrent with his sentence in *United States v. Jayquan Allen Jones*,

---

[139] *See* Doc. 105 at 1–3.
[140] *Id.*

4:23-cr-90.

Respectfully submitted,
**JAYQUAN ALLEN JONES**

s/ Bernadette Donovan

Bernadette M. Donovan
VA BAR 82054
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Office 800-428-5214
Fax 434-465-6866
bernadette@donovanengle.com

David M. Good
VA BAR 44107
David Michael Good, P.C.
249 Central Park Avenue, Suite 300-247
Virginia Beach, VA 23462
Office 757-306-1331
Fax 888-306-2608
dgood@dgoodlaw.com

*Counsel for Jayquan Allen Jones*

### CERTIFICATE OF SERVICE

I, Bernadette Donovan, Esq., hereby certify that on this December 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record. A Notice of Electronic Filing will be served on:

Lisa Rae McKeel
David M. Coleman
Alyssa Levey-Weinstein
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
One City Center
11815 Fountain Way
Suite 200
Newport News, VA 23606

Tel: 757-591-4000
Lisa.McKeel@usdoj.gov
Mack.Coleman@usdoj.gov
Alyssa.Levey-Weinstein@usdoj.gov